**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

───────────────────────────────

**ELNORA WILLIAMS,**

                               **Plaintiff,**                    **12-CV-411S(Sr)**

**v.**

**FORD MOTOR COMPANY,**

                               **Defendant.**

───────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

          This case was referred to the undersigned by the Hon. Richard J. Arcara,

pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon

dispositive motions.  Dkt. #11.  Thereafter, the Hon. Richard J. Arcara issued an Order

recusing himself in this case (Dkt. #13) and the Hon. William M. Skretny was assigned

to handle the case.


          Currently before the Court is defendant's motion for summary judgment.

Dkt. #21.  For the following reasons, it is recommended that defendant's motion for

summary judgment be granted.


## PROCEDURAL BACKGROUND

          Plaintiff commenced this action on May 4, 2012 against Ford Motor

Stamping Plant.  Dkt. #1.  Thereafter, on June 6, 2012, plaintiff filed an Amended

Complaint against Ford Motor Company.  Dkt. #4.  Plaintiff's Amended Complaint

alleges the following three causes of action:  discrimination on the basis of gender and race in violation of Title VII; retaliation in violation of Title VII; and, age discrimination in violation of the Age Discrimination in Employment Act ("ADEA").  *Id*.  Defendant Ford Motor Company filed its Answer on August 2, 2012.  Dkt. #14.  The instant motion for summary judgment was filed on July 15, 2013.  Dkt. #21.


**General Allegations in the Amended Complaint**

Plaintiff, a 62 year-old African American woman, alleges that she is one of only two African American individuals ever employed in the Industrial Truck Repair Department at Ford's Buffalo Stamping Plant.  Dkt. #4, ¶¶10-12.  She has been employed in that department consistently since 1992.  *Id*. at ¶9.  Plaintiff alleges that she and the only other African American employee in the Industrial Truck Repair Department were brought in at the same time and when they arrived, the Supervisor asked, "Why do we have to get two niggers?"  *Id*. at ¶14.  Shortly thereafter, when she and the other African American employee asked when they would be trained on the new crane, a representative of defendant stated, "never."  *Id*. at ¶15.[1]


Plaintiff alleges that since the beginning of her employment in the Industrial Truck Repair Department, "her supervisors and co-workers refused to give [her] proper training, relegating her to only the menial tasks in the department.  One co-worker stated that she would 'get a journeyman's card but wouldn't be able to do the

---

[1] By plaintiff's own admission, these allegations date back to plaintiff's early days in the Industrial Truck Repair Department, circa 1992, and therefore, are time-barred.

work.' No employee would train her to do the work.  No employee would sign her forms, verifying that she had been trained." *Id*. at ¶17.  Ms. Williams alleges that she was assigned to replace batteries, which she describes as the "most menial task available," requiring no skill or training.  *Id*. at ¶19.  In fact, Ms. Williams alleges that she had "to learn her various assignments on her own, without assistance, through trial and error." *Id*. at ¶20.

Ms. Williams further alleges that although other employees were sent for training to repair new vehicles, she was never sent and every time she asked for training, defendant declined to allow it.  *Id*. at ¶21.  The Amended Complaint states that defendant passed Ms. Williams over for overtime in favor of younger white males who had less seniority.  *Id*. at ¶ 22.  In the Spring 2009, Ms. Williams worked third shift while younger, white males were given the first shift.  *Id*. at ¶25.  Moreover, the younger, white males were permitted to work overtime.  *Id*. at ¶26.  In late Spring 2009, Ms. Williams alleges that the younger, white males were offered training on the Linde fork trucks.  *Id*. at ¶29.  Although she requested to be trained as well, plaintiff alleges that defendant declined.  *Id*.

When another employee with more seniority and who had been working first shift decided to retire, his retirement would have bumped Ms. Williams to first shift and a younger, white male employee with less seniority, Scott Parks, would then be bumped from second shift to third shift.  *Id*. at ¶30.  However, according to Ms.

Williams, Scott Parks did not want to be bumped from second shift to third shift.  Both Ms. Williams and another employee, Glen Scott, bid on the first shift position.  Glen Scott was a white male who was less senior than Ms. Williams.  *Id*. at ¶¶32-33. According to Ms. Williams, just after she told her supervisor that she had bid on the first shift position, Supervisor Pat McCulligan and some other male employees from the Industrial Truck Repair Department met and decided to eliminate the first shift so Ms. Williams could not take it.  *Id*. at ¶36.

On June 22, 2009, Ms. Williams complained to the Human Resources Department that she was being subjected to unlawful discrimination.  *Id*. at ¶38. Specifically, Ms. Williams alleges that she explained to the Human Resources Department, "that her supervisors refused to train her, that she was being denied overtime, and that the men in her department had conspired to eliminate the first shift so as to prevent a black woman from bumping a younger, white male."  *Id*.  The next day, June 23, 2009, Ms. Williams alleges that she was assigned to work second shift after having work third shift for approximately 12-15 years.  *Id*. at ¶39.

On June 24, 2009, Ms. Williams reported the alleged retaliation to the Human Resources Department and she claims that the Human Resources Department forced her supervisor to return her to third shift.  *Id*. at ¶¶40-41.  Ms. Williams alleges that Human Resources employee Anata Jacobs was assigned to conduct an investigation into the alleged discrimination and retaliation.  However, according to Ms.

Williams, Ms. Jacobs never reported the findings of the investigation to her. *Id*. at ¶¶42-46.

On June 24, 2009, Ms. Williams filed a complaint with the Equal Employment Opportunity Commission alleging unlawful discrimination because she was being denied overtime, training and eliminating the first shift to prevent her from bumping a young, white, male employee. *Id*. at ¶47. Ms. Williams alleges that a few months later, she was again moved to second shift and defendant began to discipline her for tasks and problems that were entirely out of her control. *Id*. at ¶¶49-50. In March 2011, Ms. Williams was assigned the task of putting water into truck batteries and to keep a diary of which trucks had been watered and equalized. *Id*. at ¶52. When she was assigned this task, Ms. Williams alleges that she had to learn for herself how the batteries functioned. *Id*. Ms. Williams further alleges that she was never assigned to diagnose and repair the "batteries' function." *Id*. Ms. Williams maintains that "many of the batteries had mechanical problems. Many of the batteries did not have functioning indicators that would show when the water was high enough in the battery." *Id*. at ¶53.

In March 2011, a driver was unable to start his truck because there was no water in the battery. Ms. Williams' supervisor, Pat McCulligan ordered that she be disciplined. Ms. Williams alleges that she continually reported that batteries were malfunctioning and that there were no formal procedures or training for how to handle

the batteries or for how to fill them.  *Id*. at ¶64.  According to Ms. Williams, Supervisor

McCulligan recommended that she be disciplined for failing to repair the batteries, even

though she claims she had never been assigned to repair the batteries.  *Id*. at ¶65.

Ms. Williams alleges that on June 6, 2011, Supervisor McCulligan "wrote her up for

'poor and careless workmanship.'" *Id*. at ¶71.  Supervisor McCulligan suspended her for

three 12-hour days and the remainder of her shift on June 6, 2011.  *Id*.  Despite her

repeated requests, Ms. Williams maintains that she was not given training.  Ms.

Williams alleges that white, male employees were given training both at the plant, as

well as outside of the plant.  *Id*. at ¶¶78 and 82.

> 79.  For example, as with the rest of her work, Ms. Williams had been given no training as to how to properly do the repairs on a vehicle to which she was assigned.  She had had to teach herself using the manual.  When Ms. Williams was doing repairs according to the vehicle's manual, her supervisor chastised her for doing the repairs incorrectly.  Ms. Williams requested training so that she would be able to make the repairs according to her supervisor's specifications.  Her supervisor sent an email in which he stated that there was no point in training her.

> 80.  On another occasion, Supervisor McCulligan chastised her and ordered her to clean up an acid spill from a battery that had overflowed.  Since many of the batteries had no gauge to indicate when they were full, the batteries did often overflow.  Ms. Williams asked for training as to how to fill the batteries so that they would not overflow.  Supervisor McCulligan refused to respond.

> 81.  On another occasion a white, male employee stood over Ms. Williams as she made a repair.  Again, she had not been given training as to how to make this repair.  The white, male employee watched her make a mistake.  Rather than show her how to properly make the repair, he walked over to her supervisor and reported that she had made a mistake.  Still, the supervisor did not train her.

*Id*. at ¶¶79-81.  Lastly, Ms. Williams alleges that defendant refused to give her training,

refused to give her a key to the robot repair department/office, failed to replace a tool

that was stolen, and continued to assign her to menial tasks.  "Defendant has

continually put Ms. Williams in the untenable position of refusing to train her and then,

when she does not know how to perform certain tasks for lack of training, accusing her

of being too lazy to learn and refusing again to train her because of her "laziness."

White male employees are given training and highly skilled tasks."  *Id*. at ¶¶93-94.


## FACTUAL BACKGROUND

**General Information**

Plaintiff, Elnora Williams, is an African-American woman whose date of

birth is June 8, 1950.  Dkt. #23, ¶3; Dkt. #28-2, p.1; Dkt. #28-3, ¶¶1 and 3.  Ms.

Williams has been employed by Ford at its Buffalo Stamping Plant since 1986.[2]  Dkt.

#23, ¶4; Dkt. #28-3, ¶5.  From 1986 to 1992, plaintiff worked as a production supervisor

when she voluntarily transferred into the Ford-UAW skilled trades apprenticeship

program for industrial truck repair.  Dkt. #23, ¶6; Dkt. #28-2, ¶6; Dkt. #28-3, ¶6.  Plaintiff

completed the apprenticeship program in 1995 and received her "journeyman's card."

Dkt. #23, ¶12; Dkt. #28-2, ¶12.  Plaintiff maintains that both during the apprenticeship

---

[2] In its Rule 56.1 Statement of Undisputed Facts, defendant Ford states that plaintiff has been employed by Ford at the Buffalo Stamping Plant since November 24, 1986.  Dkt. #23, ¶4.  However, in her affidavit submitted in opposition to the instant motion for summary judgment, plaintiff states that she returned to Ford in January, 1986.  Dkt. #28-3, ¶5.  Both parties agree, however, that plaintiff first worked for Ford as a hourly production employee from 1977 until she was laid off in 1980, returning to Ford sometime in 1986.  *Id*.

program and after she received her journeyman's card, she complained to her

supervisor that the card was "useless" because of the lack of training she received.

Dkt. #28-2, ¶12.


Plaintiff is currently employed at the Buffalo Stamping Plant in the

Industrial Truck Repair Department.  Dkt. #23, ¶5; Dkt. #28-2, ¶5; Dkt. #28-3, ¶7.

"Employees in the Industrial Truck Repair department are skilled mechanics who have

journeyman cards in industrial truck repair.  They are responsible for maintaining and

repairing the various industrial vehicles utilized both inside and outside the facility."  Dkt.

#23, ¶13; Dkt. #28-2, ¶13.  When plaintiff started in the Industrial Truck Repair

department, there were as many as 30 to 35 employees.  Dkt. #23, ¶15  Plaintiff

believes the number of employees to have been 25 to 30 at the time she started in the

department.  Dkt. #28-2, ¶15.  As of January 2009, there were nine Industrial Truck

Repair employees and all of the employees were Caucasian males except for plaintiff.

Dkt. #23, ¶15.  At the time of plaintiff's deposition, there were five employees in the

Industrial Truck Department.  *Id*.  Employees in the Industrial Truck Repair Department

are each assigned to one of three shifts, first shift, 11:00 p.m. to 7:30 a.m., second

shift, 7:00 a.m. to 3:30 p.m. and third shift, 3:00 p.m. to 11:30 p.m.[3]  Through 2009,

plaintiff principally worked third shift.  Dkt. #23, ¶18.  The parties agree that third shift is

---

[3] The parties disagree as to the start and end times of the second shift.  See
Plaintiff's Opposing Statement in Response to Defendant's Local Rule 56.1 Statement
of Undisputed Material Facts, p.2 ("The starting time for the second shift is 6:30 a.m.
and the ending time for the second shift is 3 p.m.").

characterized as an "off" shift and plaintiff was often the only one assigned to the shift. Dkt. #23, ¶19.


Plaintiff claims that she was denied training and that her co-workers received more training than she did.  Dkt. #23, ¶27.  Defendant Ford asserts that,

> 28.  Any formal training offered to Industrial Truck Repair employees is dependant upon business needs.  Factors include whether new vehicles or new technologies are being utilized at the facility, budget constraints, and management discretion.  On the rare occasions formal training occurs it is typically offered to all Industrial Truck Repair employees and most often takes place in a classroom setting.  There may be occasions when certain employees receive training not offered to all of the employees based on the particular expertise of the employees.  Industrial Truck Repair employees often develop an expertise on a particular vehicle or type of vehicle. . . . As a result, they may have been provided training opportunities specific to these duties.

> 29.  Most training for Industrial Truck Repair employees is on-the-job training.  Employees learn from each other and from vendors or suppliers who may come into the plant to assist with the repairs or maintenance of certain vehicles.  This on-the-job training is available to all employees in the department.  The value of such training is mostly dependent on the initiative of employees to seek out the training, ask questions and work with the vendors.

Dkt. #23, ¶¶28-29 (internal citations omitted).  Plaintiff admits that she does not know to what degree her co-workers are self-taught.  Dkt. #23, ¶30; Dkt. #28-2, ¶30.  Basing her belief that her co-workers were sent offsite for training on information she received from co-workers, plaintiff admits that she does not know when the alleged training occurred or the specifics of the training. Dkt. #23, ¶33.  Plaintiff further admits that one of her co-workers, Dave Yonkosky testified that all of the Industrial Truck Repair employees

requested training on the scooters and were denied and further that other Industrial

Truck Repair employees had complaints about training.  Dkt. #23, ¶34.  Indeed, the

only training that plaintiff can specifically identify as having been denied is the Linde

fork truck training purportedly scheduled for July 2009.  Dkt. #23, ¶36.  There is no

dispute, plaintiff was neither assigned to work on Linde fork trucks, nor did the training

occur in July 2009, for anyone.  All Industrial Truck Repair employees, including

plaintiff, received the training on the Linde fork trucks in Fall 2010.  *Id*.


          For most of her employment, until 2010, plaintiff worked the third shift and

by her own admission, preferred third shift because the employees were less

contentious with each other and the hours were better for her family.  Dkt. #23, ¶18;

Dkt. #28-2, ¶18.  For a period of time in 2010, plaintiff worked the day shift and then

later elected to work another off-shift, the Alternative Work Schedule ("AWS") shift,

when it became available.  Dkt. #23, ¶37; Dkt. #28-2, ¶37.  According to Ford,

"[e]mployees who work the off-shift may not have the same on-the-job training

opportunities and may not be given the same complexity of assignments because they

do not have the assistance of their co-workers."  Dkt. #23, ¶37.


          Plaintiff further claims that she has been denied overtime opportunities

equal to her co-workers.  Plaintiff admits that she premised her discriminatory overtime

claim on the cumulative overtime numbers in the Timekeeping/Work Order System

(TWOS) reports.  Dkt. #23, ¶40; Dkt. #28-2, ¶40.  The parties agree that the TWOS

reports show overtime hours worked and refused for hourly employees by classification

for each weekly pay period.  Dkt. #23, ¶41; Dkt. #28-2, ¶41.  Plaintiff asserts that the

TWOS reports were sometimes inaccurate and adjusted hours were noted in

subsequent reports that were not noted in earlier TWOS reports.  Dkt. #28-2, ¶41.  Ford

explains that,

> 41. . . . The TWOS reports also tally the cumulative overtime
> for hours worked and refused for each shift because under
> the collective bargaining agreement between Ford and the
> UAW, Ford has an obligation to equalize overtime
> opportunities for employees within the same classification
> who are assigned to the same shift.  This is true for both
> hourly production employees covered by the collective
> bargaining agreement and for skilled trades' employees.
> Certain Ford facilities have local agreements with the UAW
> that specify various administrative provisions negotiated to
> provide equitable overtime opportunities among employees
> in the same equalization group.
>
> 42.  In order to track shift overtime numbers for equalization
> purposes, when employees transfer to a different shift and
> remain on the new shift for 30 days or more, they drop their
> own cumulative overtime hours and are assigned the high
> cumulative overtime hours on that shift within the
> equalization group.  The cumulative shift overtime numbers
> on TWOS reports accumulate over an extended period
> (often years) and are not attributable to a particular
> employee or group of employees.

Dkt. #23, ¶¶41-42 (internal citations omitted).


Ford argues that plaintiff has "inaccurately interpreted" the cumulative shift

hours reflected on the TWOS reports for 2009.  Dkt. #23, ¶43.  In fact, Ford states that

the reports for 2009 show approximately 7000 fewer cumulative overtime hours on third

shift compared to second shift.  However, contrary to plaintiff's assertions, the reports

do not reflect that Ms. Williams received fewer overtime opportunities in 2009 than the employees on the day shift.  *Id*. at ¶44.  In fact, Ford further explains that,

> 45.  [t]he most accurate way to calculate and compare the overtime worked and refused for each employee in a particular classification is to add the overtime numbers assigned to each employee for each weekly pay period.
>
> 46.  The summaries reflecting the overtime hours worked and refused for Industrial Truck Repair employees at the Buffalo Stamping Plant indicate that Ms. Williams actually received more overtime opportunities than her co-workers for the years 2009, 2010, and 2012.

Dkt. #23, ¶¶45-46 (internal citations omitted).

Although the parties disagree as to the timing of his retirement, it is undisputed that plaintiff wanted to replace the retiring John Hody on first shift in either May or June, 2009.  Dkt. #23, ¶47, Dkt. #28-2, ¶47.  According to plaintiff, she had many reasons for wanting to move from third shift to first shift, including that there was a 10% premium on first shift and because she perceived that there was an opportunity for more overtime on first shift.  *Id*.  According to Ford, shift assignment is based on seniority, as well as shift preference cards submitted to Labor Relations throughout the year.  Plaintiff's shift preference card reflected her preference for first shift.  Dkt. #23, ¶48.  Without elaboration, plaintiff simply states that, "in practice, Defendant assigned employee shifts different from its formal written policy."  Dkt. #28-2, ¶48.  Contrary to plaintiff's speculation, the decision to eliminate first shift for the Industrial Truck Repair department was made by Patrick McCulligan.  Dkt. #23 ¶49.  In his affidavit submitted in support of defendant's motion for summary judgment, McCulligan states,

> In 2009, I made the decision to consolidate all of the Industrial Truck Repair employees onto the second or day shift. Previously, there had been a battery room where batteries were physically removed from the industrial vehicles and were charged and watered. One Industrial Truck Repair employee on each shift was assigned to staff this room and charge and water the batteries. The technology and processes for maintaining the batteries changed. Instead of using a battery room for charging and watering the batteries, the new technology permitted employees to utilize a mobile watering system to water the vehicle batteries on the plant floor and the trucks were retrofitted to permit on-board charging. With this change in the battery maintenance technology, there was no longer a need for the battery room or for an Industrial Truck Repair employee to staff the battery room. Because the primary responsibility of the Industrial Truck Repair employee assigned to both the first shift and the third shift was to staff the battery room, I made the decision to eliminate those shifts and consolidate all of the Industrial Truck Repair employees on one shift, the day shift. This consolidation saved shift premium costs and provided necessary support to production on the day shift. There were additional benefits. The Industrial Truck Repair employees often worked together and learned from one another. There was increased oversight of an accountability for employees working on the day shift because their immediate supervisor also worked the day shift and was present to make assignments, monitor work, and provide assistance, if needed.

Dkt. #25-1, ¶6. Based on information provided to her from her co-worker Dave

Yonkosky, plaintiff speculates that the decision to eliminate first shift was discriminatory.

Dave Yonkosky told plaintiff about a meeting between her co-workers and a supervisor

where the elimination of first shift was discussed so that another co-worker would not

have to move to third shift to replace plaintiff. Dkt. #23, ¶50. It is undisputed that

neither plaintiff nor the ultimate decision-maker, Pat McCulligan, attended the meeting.

*Id*.

In January 2010, plaintiff was assigned to second shift and since that time there has been no Industrial Truck Repair employee assigned to first or third shift. Dkt. #23, ¶56; Dkt. #28-2, ¶56. Plaintiff remained on second shift until November 2010 when she elected to go to a new "Alternative Work Schedule." Dkt. #23, ¶56; Dkt. #28-2, ¶56.

The parties disagree whether plaintiff's primary responsibility on the Alternative Work Schedule is "battery maintenance" according to defendant or "putting water in the batteries" as plaintiff asserts. Dkt. #23, ¶ 59; Dkt. #28-2, ¶59. However, the parties agree that on Saturdays plaintiff would locate the fork trucks, drive the trucks to charging stations and plug them in to allow the batteries to charge and equalize. And on Sundays, plaintiff would water the batteries. Dkt. #23, ¶60; Dkt. #28-2, ¶60. Plaintiff does add that she has "questions about its efficiency and effectiveness." Dkt. #28-2, ¶60. Defendant Ford describes that on April 15, 2011, plaintiff's supervisor, Barbara Cline-Krueger and her boss, Patrick McCulligan, learned that there were truck batteries that were "bone dry." Dkt. #23, ¶62. According to Ford, "[t]he process is to initial a sticker on the truck indicating that the battery had been watered. About 20 trucks were audited and there were no initials on any of them." *Id*. Plaintiff disagrees and states that she "denies the trucks were initialed but rather were circled to indicate they had been watered. In addition, a sheet needs to be filled out. The purpose of the sheet was to record what truck had been watered and equalized." Dkt. #28-2,¶60. In addition, Ford states that there had been incidents involving battery failure and that McCulligan had concluded that certain of the batteries had not been watered. Dkt. #23,

¶60.  The parties agree that the following week, a supervisor, Dave Sillick, conducted a floor discussion with plaintiff and told her that she was not watering the batteries and because she was not watering or not doing so properly, the batteries were "burning up." Dkt. #23, ¶63; Dkt. #28-2, ¶63.  Following her discussion with Supervisor Sillick and while the issue was being investigated, plaintiff called Human Resources at Ford's Corporate Headquarters in Michigan to complain about her treatment and to advise that the suggestion that she was neglecting her duties was baseless.  Dkt. #23, ¶64; Dkt. #28-2, ¶64.  Finally, in June 2011, plaintiff received a three day unpaid suspension for poor and careless workmanship.  Dkt. #23, ¶65.  Plaintiff admits that she was disciplined but maintains that the discipline was discriminatory and retaliatory. Dkt. #28-2, ¶65.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted); *see also*, *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162,167 (2d Cir. 1991).

A fact is considered to be "material" only if it "might affect the outcome of the suit under the governing law . . . ," and a dispute regarding a material fact is considered to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bryant v Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991) and *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  The court's role in ruling on a summary judgment motion is not to resolve issues of fact, but rather to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  When "little or no evidence may be found in support of the nonmoving party's case . . . [and] no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotations omitted).  Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001).  Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "pure conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).  In fact, "Courts within the Second Circuit have

not hesitated to grant defendants summary judgment in such cases where ... plaintiff has offered little or no evidence of discrimination." *Feinerman v. T-Mobile USA*, No. 08 Civ. 3517 (SAS), 2010 WL 331692, at *7 (S.D.N.Y. Jan. 28, 2010), *quoting*, *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. 3:02CV1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004).

**Title VII**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's race, color, religion, sex, or national origin." Title 42, United States Code, Section 2000e-2(a)(1). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004). "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir.), *cert. denied*, 522 U.S. 997 (1997).

**Discrimination**

To state a claim of discrimination, whether sex discrimination under Title VII or age discrimination under the ADEA, a plaintiff must plead facts plausibly

suggesting that: (1) he was within the protected class; (2) he was qualified for the position; (3) he was subject to adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Bucalo v. Shelter Island Union Free Sch. Dist.,* 691 F.3d 119, 129 (2d Cir. 2012); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. In order to meet this showing a plaintiff must demonstrate that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009), *citing*, *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003). Once a plaintiff has established a *prima facie* case of unlawful discrimination, the employer must then "articulate some legitimate, nondiscriminatory reason" for the action. *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 96, 106 (2d Cir. 2010) *quoting*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The employer need not prove that its actions were nondiscriminatory; it need only "articulate" a legitimate, nondiscriminatory reason for them. *Board of Trustees of Keane State College v. Sweeney*, 439 U.S. 24, 25 (1978).

Once the employer has advanced a nondiscriminatory reason for its action, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered reason was a mere pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Board of Trustees of Keane*

*State College v. Sweeney*, 439 U.S. at 25.  A plaintiff may demonstrate pretext in one of two ways: (i) by persuading the court that a discriminatory reason more likely motivated the employer than its articulated reason, or (ii) by indirectly showing that the employer's proffered explanation is unworthy of credence.  *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983); *Burdine*, 450 U.S. at 256.  While under *McDonnell Douglas* the burden of producing evidence shifts from the plaintiff to the employer and back to the plaintiff, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

> In meeting this ultimate burden of persuasion, a title VII plaintiff need not show that an illegal factor was the sole motive for the employer's action. She need only demonstrate that an illegal motive played a significant part in the adverse decision; in other words, she must show that "but for" the illegal factor, she would not have been treated as she was. See, e.g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976). Thus, it is sufficient if that factor was one of many factors, including legitimate ones, that motivated the employer. See, e.g., Lewis v. University of Pittsburgh, 725 F.2d 910, 915 (3d Cir.1983), cert. denied, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); Lincoln v. Board of Regents, 697 F.2d 928, 938 (11th Cir.), cert. denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); Geller v. Markham, 635 F.2d 1027, 1035 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); see generally Brodin, The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective, 82 Colum.L.Rev. 292 (1982).

*Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1541 (S.D.N.Y. 1986).

As a threshold matter, Ford does not dispute that plaintiff can establish the first two elements of her prima facie case, *to wit*, that she is a member of a protected class and that, for purposes of this motion, she is qualified for her position. Dkt. #22, p.7.  However, by this motion Ford maintains that plaintiff is unable to satisfy the third and fourth elements to establish a prima facie case of discrimination, that she suffered an adverse employment action and that the action occurred under circumstances giving rise to an inference of discrimination.  *Id*.  Finally, Ford submits that no evidence exists that even suggests that Ford's non-discriminatory reasons for the challenged actions are a pretext for discrimination.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation omitted).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.*  "An adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment.

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002), *quoting, Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994).


**Work Assignments and Training**

   In her Amended Complaint, plaintiff complains of being assigned to replace batteries, which she describes as the "most menial task available" requiring no skill or training.  Dkt. #4, ¶19.  In fact, Ms. Williams alleges that she had "to learn her various assignments on her own, without assistance, through trial and error."  *Id*. at ¶20.  Plaintiff further complains that although she repeatedly requested training, defendant Ford declined to allow it.  *Id*. at ¶21.  Plaintiff also maintains that she was passed over for overtime in favor of younger white males who had less seniority.  *Id*. at ¶22.  Ms. Williams alleges that first shift was eliminated so she could not take the open position created by a retirement.  *Id*. at ¶¶30-36.  Plaintiff's allegations concerning overtime and shift elimination will be addressed separately below.


   Where assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action.  *Grant v. New York State Office for People with Disabilities,* No. 12-CV-4729, 2013 WL 3973168, at *7  (E.D.N.Y. July 30, 2013) (collecting cases); *Williams v. New York City Hous. Auth.*,  No. 03 Civ. 7764, 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008), *aff'd*, 361 Fed. Appx. 220 (2d Cir. Jan. 19, 2010)*; see Billingslea v. Ford Motor Co., Inc.*, No. 06-cv-556, 2010 WL 4861500, at *7

(W.D.N.Y. Nov. 30, 2010) ("A plaintiff's assigned task, however undesirable it may be, does not constitute an adverse employment action . . . if it falls within his . . . job responsibilities."); *Martin v. MTA Bridges & Tunnels*, 610 F. Supp.2d 238, 254 (S.D.N.Y. 2009) ("No reasonable employee would think being asked to perform tasks that are part of her job description constituted a materially adverse employment action.").  In contrast, the assignment of a disproportionately heavy workload constitutes an adverse employment action.  *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004).

In the instant case, plaintiff asserts that the tasks she was assigned, replacing and watering batteries, were the most menial tasks available and required no skill or training.  Curiously, then plaintiff alleges that in order to perform her assignments, she had "to learn her various assignments on her own, without assistance, through trial and error."  Dkt. #4, ¶19.  The fact that plaintiff perceived her assignments as menial and requiring no skill or training is insufficient, without more, to plausibly allege an adverse employment action.  Moreover, plaintiff's own allegations and arguments are illogical and contradictory.  On the one hand plaintiff complains that her assigned tasks are menial and require no skill or training and then, on the other hand, she complains that she wasn't offered training.  Finally, plaintiff admits to having been disciplined following an incident where it was discovered that the batteries had not been watered or had been watered improperly.

Defendant argues that plaintiff has not alleged an adverse employment action with respect to her claim that she was denied training.  Indeed, defendant argues,

> Plaintiff speculates that she has not received the same training opportunities as her coworkers.  But when asked for specifics in her deposition, Plaintiff testified that it is her understanding that some of her coworkers have been sent out for training, she does not know the specifics of or when such training occurred, and only "believes" that others had been sent out.  Her belief is based on comments from her co-worker, Dave Yonkosky.  The only training within the limitations period that Plaintiff specifically identifies as having been denied is training on Linde fork trucks that she claims was to occur in the summer of 2009.[3] [footnote "3" in original - Plaintiff contends she was denied training as part of the apprenticeship program, but this occurred long before the limitations period.  Plaintiff also describes being denied a single point lesson on ABC inspections.  This occurred in 2006 and is also time-barred.]

Dkt. #22, p.8 (internal citations omitted).  While the denial of professional training opportunities may constitute an adverse employment action where it bears on either plaintiff's opportunities for professional growth and career advancement or directly upon plaintiff's compensation, plaintiff has alleged no material harm resulting from Ford's purported refusal to train her. *See Majeed v. ADF Cos.*, No. 11-CV-5459, 2013 WL 654416 at *8 (E.D.N.Y. Feb. 20, 2013); *Hill v. Rayboy-Brauestein*, 467 F. Supp.2d 336, 352 (S.D.N.Y. 2006).  As cited above, the only training that plaintiff can identify that she was denied was the training on Linde fork trucks which she claims was to occur in the summer of 2009.  It is undisputed that no one received the Linde fork truck training scheduled for July 2009 because it was not held at that time.  All Industrial Truck Repair

employees, including plaintiff, received the training on the Linde fork trucks in the fall of 2010.

In addition, plaintiff cannot establish that the non-discriminatory reasons for Ford's training decisions are a pretext for discrimination.  Defendant Ford makes it clear that most training for Industrial Truck Repair employees is on-the-job training. Indeed, Ford explains that employees learn from each other and from vendors or suppliers who may come into the plant to assist with the repairs or maintenance of certain vehicles.  Ford states, "[t]his on-the-job training is available to all employees in the department.  The value of such training is mostly dependent on the initiative of employees to seek out the training, ask questions and work with the vendors."  Dkt. #23, ¶29.  It is undisputed that for most of her employment, until 2010, plaintiff worked the third shift and by her own admission, preferred third shift because the employees were less contentious with each other and the hours were better for her family.  Dkt. #23, ¶18; Dkt. #28-1, ¶18.  For a period of time in 2010, plaintiff worked the day shift and then later elected to work another off-shift, the Alternative Work Schedule shift, when it became available.  According to Ford, "[e]mployees who work the off-shift may not have the same on-the-job training opportunities and may not be given the same complexity of assignments because they do not have the assistance of their co-workers."  Dkt. #23, ¶37.

**Overtime**

As with her other claims, plaintiff has failed to establish a prima facie case supporting her claim that she was denied overtime opportunities.  In fact, the undisputed record demonstrates that plaintiff actually received more overtime than her co-workers in three of the four years since 2009.  In her affidavit submitted in opposition to the instant motion, plaintiff claims to have "consulted the hourly work records H-719 forms in the union office at the plant" and claims that she was only offered 308 hours of overtime for 2011 and she should have been offered "at least seven hundred hours." Dkt. #28-3, ¶¶46-48.  Ford explains,

> The H-719 forms in the union office are the same reports as those relied upon by James Larese in calculating overtime worked for 2011 and are the same reports produced to Plaintiff in discovery at the outset of this litigation.  Those 2011 reports show that David Yonkosky worked 945 hours of overtime, Scott Parks worked 380, Wayne Lesinski worked 575.5, Glen Scott worked 1133.5, John Wright worked 780, Jeff Hosie worked 1481 and Plaintiff worked 1065.

Dkt. #29, p.5.  Thus, there can be no dispute that plaintiff's overtime was comparable, and in most instances, more than that of her co-workers.  Plaintiff's assertion that she was only offered 308 hours of overtime in 2011 is illogical given that she actually worked 1065 hours of overtime.  Plaintiff offers nothing more than her conclusory statements that she simply should have been offered more overtime, without more, plaintiff's claim must fail.

**Shift Elimination**

Plaintiff claims that the first shift was eliminated so that she could not replace the retiring John Hody and so that her younger, white male co-worker wouldn't have to move from second shift to third shift to replace her.  According to Ford, the decision to eliminate the first shift was made by Patrick McCulligan and "saved shift premium costs and provided necessary support to production on the day shift.  There were additional benefits.  The Industrial Truck repair employees often worked together and learned from one another.  There was increased oversight of an accountability for employees working on the day shift because their immediate supervisor also worked the day shift and was present to make assignments, monitor work, and provide assistance, if needed."  Dkt. #25-1, ¶6.

Again, plaintiff is unable to satisfy the third and fourth elements to establish a prima facie case of discrimination, that she suffered an adverse employment action and that the action occurred under circumstances giving rise to an inference of discrimination.  In order to establish that she has suffered an adverse employment action, plaintiff must demonstrate that she endured "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation omitted).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation." *Id.* Here, there is no evidence whatsoever to suggest that the decision to eliminate the first shift position was an adverse employment action. "An employee's subjective dissatisfaction with his or her current position, or subjective desire for the position denied him or her, is not enough to constitute an adverse employment action." *Ash v. State of New York Unified Court System*, No. 00 Civ. 9849, 2005 WL 287416, *4 (S.D.N.Y. Feb. 2, 2005), *quoting*, *Meckenberg v. N.Y. City Off-Track Betting*, 32, F.Supp.2d 359, 378 (S.D.N.Y.1999).

Even if plaintiff was able to demonstrate that the elimination of the first shift position was an adverse employment action, plaintiff is unable to show that it was done under circumstances giving rise to an inference of discrimination. Here, there are no facts to even suggest that other similarly situated persons were treated more favorably. The undisputed facts are that the first shift position vacated by the retirement of John Hody was eliminated and no one replaced Hody in that position. Therefore, plaintiff simply cannot show that similarly situated employees outside the protected class were treated more favorably.

**Retaliation**

Defendant argues that plaintiff has failed to offer any evidence of a causal connection between her 2009 complaints and her 2011 discipline. Specifically, defendant states, "the two years between Plaintiff's complaints and her June 2011 discipline eliminates any inference Plaintiff can draw that the two are connected." Dkt.

#22, p.14.  Although the parties disagree whether plaintiff's primary responsibility on the Alternative Work Schedule was "battery maintenance" according to defendant or "putting water in the batteries" as plaintiff asserts, it is undisputed that on April 15, 2011, plaintiff's supervisor, Barbara Cline-Krueger and her boss, Patrick McCulligan, learned that there were truck batteries that were "bone dry."  Dkt. #23, ¶¶ 59 and 62; Dkt. #28-2, ¶59.  In addition, Ford states that there had been incidents involving battery failure and that McCulligan had concluded that certain of the batteries had not been watered.  Dkt. #23, ¶60.  The parties agree that the following week, a supervisor, Dave Sillick, conducted a floor discussion with plaintiff and told her that she was not watering the batteries and because she was not watering or not doing so properly, the batteries were "burning up."  Dkt. #23, ¶63; Dkt. #28-2, ¶63.  Following her discussion with Supervisor Sillick and while the issue was being investigated, plaintiff called Human Resources at Ford's Corporate Headquarters in Michigan to complain about her treatment and to advise that the suggestion that she was neglecting her duties was baseless.  Dkt. #23, ¶64; Dkt. #28-2, ¶64.  In June 2011, plaintiff received a three day unpaid suspension for poor and careless workmanship.  Dkt. #23, ¶65.  Plaintiff admits that she was disciplined, but maintains that the discipline was discriminatory and retaliatory. Dkt. #28-2, ¶65.

To state a claim for retaliation in violation of Title VII and/or the ADEA, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected

activity and the adverse action.  *Bucalo v. Shelter Island Union Free Sch. Dist.,* 691

F.3d 119, 129 (2d Cir. 2012).  "The term 'protected activity' refers to action taken to

protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202

F.3d 560, 566 (2d Cir. 2000). "The onus is on the speaker to clarify to the employer that

he is complaining of unfair treatment due to his membership in a protected class and

that he is not complaining merely of unfair treatment generally."  *Aspilaire v. Wyeth*

*Pharm., Inc.*, 612 F. Supp.2d 289, 308-09 (S.D.N.Y. 2009).  Thus, "[t]o the extent that

an employee complains about perceived 'unfair' treatment relating to job responsibility,

hiring practices, or corporate policy, but fails to link the treatment to unlawful

discrimination or to his protected status, he fails to establish that he was engaged in

protected activity."  *Penberg v. HealthBridge Mgmt.*, 823 F. Supp.2d 166, 191 (E.D.N.Y.

2011); *See Galdieri-Ambrosini v. National Realty & Dev.*, 136 F.3d 276, 292 (2d Cir.

1998) ("implicit in the requirement that the employer have been aware of the protected

activity is the requirement that it understood, or could reasonably have understood, that

the plaintiff's opposition was directed at conduct prohibited by Title VII." ).


   In opposition to the instant motion for summary judgment, plaintiff asserts,

"white males who watered the batteries, and who had not done their jobs properly, and

who actually caused damage to the batteries, and who were known for failing to

perform their duties, were never disciplined."  Dkt. #28-3, ¶34.  Absent plaintiff's own

self-serving statements concerning Ford's failure to discipline other white males for

allegedly failing to perform their duties, plaintiff offers no evidence to support her

assertion.  Without more, plaintiff's speculation and conjecture that her discipline was motivated by discrimination is insufficient to defeat defendant's motion for summary judgment on her retaliation claim.

## CONCLUSION

For the foregoing reasons, this Court recommends that defendant's motion for summary judgment (Dkt. #21) be granted in its entirety.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

**Failure to comply with the provisions of Local Rule 72 may result in the District**

**Judge's refusal to consider the objection.**


      **SO ORDERED.**


DATED:     Buffalo, New York
             January 14, 2014


                        *s/ H. Kenneth Schroeder, Jr.*
                        **H. KENNETH SCHROEDER, JR.**
                        **United States Magistrate Judge**